The Honorable Brian A. Tsuchida

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO.   MJ16-415 |
| Plaintiff, | **COMPLAINT** |
| v. | Counts 1, 2, and 3<br>18 U.S.C. § 1951(a)<br>(Extortion Under Color of Official Right) |
| MICHAEL W. BOWDEN, | |
| Defendant. | Count 4<br>21 U.S.C. §§ 846 and 841(a)(1)<br>and (b)(1)(C)<br>(Attempted Distribution of a Controlled<br>Substance) |

BEFORE the Honorable Brian A. Tsuchida, United States Magistrate Judge, United States Courthouse, Seattle, Washington

The undersigned complainant being duly sworn states:

### COUNT 1
### (Extortion Under Color of Official Right)

On July 12, 2016, in Everett, Washington, in the Western District of Washington and elsewhere, the defendant, MICHAEL W. BOWDEN, obstructed, delayed, and affected commerce and attempted to obstruct, delay and affect commerce, and the

Complaint/Bowden - 1

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE
5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  movement of articles and commodities in commerce, by extortion, in that defendant

2  MICHAEL W. BOWDEN obtained and attempted to obtain money from an inmate

3  housed at the Monroe Correctional Complex, a prison facility within the Washington

4  State Department of Corrections, and Individual #1, acting on the inmate's behalf, which

5  was not due defendant MICHAEL W. BOWDEN or his office, in his capacity as a

6  Correctional Officer with the Washington State Department of Corrections, under color

7  of official right.

8       All in violation of Title 18, United States Code, Section 1951(a).

9                          **COUNT 2**
10              **(Extortion Under Color of Official Right)**

11      On August 3, 2016, in Everett, Washington, in the Western District of Washington

12  and elsewhere, the defendant, MICHAEL W. BOWDEN, obstructed, delayed, and

13  affected commerce and attempted to obstruct, delay, and affect commerce, and the

14  movement of articles and commodities in commerce, by extortion, in that defendant

15  MICHAEL W. BOWDEN obtained and attempted to obtain money from an inmate

16  housed at the Monroe Correctional Complex, a prison facility within the Washington

17  State Department of Corrections, and Individual #1, acting on the inmate's behalf, which

18  was not due defendant MICHAEL W. BOWDEN or his office, in his capacity as a

19  Correctional Officer with the Washington State Department of Corrections, under color

20  of official right.

21      All in violation of Title 18, United States Code, Section 1951(a).

22                          **COUNT 3**
23              **(Extortion Under Color of Official Right)**

24      On September 20, 2016, in Everett, Washington, in the Western District of

25  Washington and elsewhere, the defendant, MICHAEL W. BOWDEN, obstructed,

26  delayed, and affected commerce and attempted to obstruct, delay, and affect commerce,

27  and the movement of articles and commodities in commerce, by extortion, in that

28  Complaint/Bowden - 2

1  defendant MICHAEL W. BOWDEN obtained and attempted to obtain money from an

2  inmate housed at the Monroe Correctional Complex, a prison facility within the

3  Washington State Department of Corrections, and Individual #1, acting on the inmate's

4  behalf, which was not due defendant MICHAEL W. BOWDEN or his office, in his

5  capacity as a Correctional Officer with the Washington State Department of Corrections,

6  under color of official right.

7  ## COUNT 4
8  **(Attempted Distribution of Methamphetamine)**

9  On or about September 20, 2016, in Monroe, Washington, in the Western District

10  of Washington and elsewhere, the defendant, MICHAEL W. BOWDEN, did knowingly

11  and intentionally attempt to distribute methamphetamine, a Schedule II controlled

12  substance.

13  In violation of Title 21, United States Code, Sections 846 and 841(a)(1) and

14  (b)(1)(C).

15

16

17

18

19

20

21

22

23

24

25

26

27

28  Complaint/Bowden - 3

1  The undersigned complainant, being duly sworn, states:

2      1.   I, Matthew A. Thoresen, am a Special Agent for the Federal Bureau of

3  Investigation ("FBI"). I have been a Special Agent for the past 7 years. During my

4  career, I have investigated cases involving bribery and corruption by federal, state and

5  local public officials, including violations in which corrupt Correctional Officers accept

6  bribe monies in exchange for facilitating the illegal introduction of contraband into prison

7  facilities. I am currently assigned to a squad that is in part responsible for the

8  investigation of public corruption. The information in this affidavit is based on my

9  personal knowledge, review of documents and other evidence, and information received

10  from other law enforcement and investigative personnel, including individuals from the

11  Intelligence and Investigations Unit at the Washington State Department of Corrections

12  Monroe Correctional Complex in Monroe, Washington.

13      2.   I believe that the investigation leading to the filing of this affidavit has

14  established probable cause to believe that MICHAEL W. BOWDEN attempted to

15  obstruct, delay or affect commerce, and the movement of articles and commodities in

16  commerce, by extortion in his capacity as a Correctional Officer with the DOC, under

17  color of official right in violation of Title 18, United States Code, Section 1951(a) and

18  knowingly and intentionally attempted to distribute methamphetamine, a controlled

19  substance, in violation of Title 21, United States Code, Sections 846 and 841(a)(1) and

20  (b)(1)(C).

21      3.   Because this Complaint is submitted for the limited purpose of establishing

22  probable cause, it does not set forth each and every fact that I or others have learned

23  during the course of this investigation. I have set forth only the facts that I believe are

24  necessary to determine the existence of probable cause that MICHAEL W. BOWDEN

25  has committed the offense of Extortion Under Color of Official Right, in violation of

26  Title 18, Section 1951(a), and Attempted Distribution of Methamphetamine, in violation

27  of Title 21, United States Code, Sections 846 and 841(a)(1) and (b)(1)(C).

28  Complaint/Bowden - 4

1

### DETAILS OF INVESTIGATION

2 **The Inception of the Investigation**

3        4.        In approximately December 2015, the FBI began conducting an

4 investigation into allegations that Washington State Correctional Officer MICHAEL W.

5 BOWDEN had solicited and received bribe money in exchange for smuggling contraband

6 chewing tobacco and illegal narcotics into the prison facility at the Monroe Correctional

7 Complex ("MCC").

8        5.        On June 14, 2016, I spoke with the Chief Investigator at the MCC who

9 detailed information received from a cooperating inmate ("Inmate-1"). Inmate-1 had

10 relayed to the Chief Investigator that BOWDEN had solicited and received a $100 bribe

11 to smuggle in one or two packages of chewing tobacco (each package containing five

12 containers of chewing tobacco) on at least five occasions. Inmate-1 alleged that

13 BOWDEN met an individual known to Inmate-1[1] outside the MCC prison facility and

14 took delivery of the tobacco and money. BOWDEN then smuggled the chewing tobacco

15 into MCC for the benefit of and delivery to Inmate-1.

16        6.        After MCC received this information from Inmate 1, I identified the

17 cellular telephone number for BOWDEN and obtained his toll records. I reviewed these

18 phone records for BOWDEN's cellular telephone and discovered at least 60 text message

19 communications between the individual known to Inmate-1 and BOWDEN, in violation

20 of DOC 850.030 (as outlined below).

21        7.        On June 28, 2016, I met with the individual known to Inmate-1 who agreed

22 to act as a confidential human source ("CHS-1"). CHS-1 confirmed knowing Inmate-1

23 and meeting in person with BOWDEN on at least five separate occasions between

24 January 2016 and April 2016 to deliver chewing tobacco and a cash bribe payment to

25 BOWDEN for smuggling the tobacco into MCC for the benefit of Inmate-1 and others.

26

27 _____

[1] As set forth in this Complaint, I opened this individual as a Confidential Human Source after receiving this

28 information from DOC-IIU. This individual is Individual #1 described in Counts 1 through 4 above.

Complaint/Bowden - 5

1   CHS-1 told me that CHS-1 and BOWDEN arranged these meetings by exchanging text
2   messages. I reviewed BOWDEN's telephone records and confirmed BOWDEN and
3   CHS-1 exchanged messages during the period between November 2015 and April 2016.
4   CHS-1 said CHS-1 paid BOWDEN $100 for each delivery of approximately five cans of
5   chewing tobacco on each of the five separate occasions. CHS-1 met BOWDEN on the
6   first two occasions at a shopping mall in Everett, WA. CHS-1 met BOWDEN on the
7   third occasion in the vicinity of his residence in Everett, WA. CHS-1 met BOWDEN in
8   the parking lot of a supermarket in Everett, WA on the fourth occasion and in the vicinity
9   of BOWDEN's residence on the fifth occasion.

10       8.    CHS-1 stated that Inmate-1 brought the allegations forward to Investigators
11  at MCC because CHS-1 became concerned when BOWDEN said he wanted to make
12  more money and could bring in "hard stuff." In my training and experience, I know that
13  a BOWDEN's reference to "hard stuff" likely meant illegal narcotics. CHS-1 became
14  increasingly concerned when BOWDEN sent a message to CHS-1 telling CHS-1 that
15  Inmate-1 and another inmate had been pulled into an office at MCC. CHS-1 took this to
16  mean that Inmate-1 was in trouble.

17       9.    CHS-1 and Inmate-1 provided information and assistance through the
18  course of the investigation with the understanding that Inmate-1 would not receive any
19  reduction in Inmate-1's period of incarceration. Inmate-1 has an extensive criminal
20  record and is currently serving a lengthy prison sentence. In addition to the concern
21  about BOWDEN's reference to "hard stuff," CHS-1 told me that CHS-1 and Inmate 1's
22  motivation to provide assistance was as follows: (1) CHS-1 and Inmate-1 want Inmate 1
23  to remain incarcerated at MCC, as opposed to another facility; and (2) both CHS-1 and
24  Inmate-1 would like MCC to modify its normal visitation policies and procedures for the

25
26
27
28  Complaint/Bowden - 6

1   benefit of Inmate-1.[2]  Inmate-1 and CHS-1 understood that no promises or guarantees

2   could or would be made by the FBI or DOC personnel concerning these requests.

3   **BOWDEN's DOC Employment**

4          10.      From July 2013 through the present, MICHAEL W. BOWDEN was a

5   Correctional Officer employed at the MCC, which is a prison facility within the

6   Washington State Department of Corrections ("DOC").

7          11.      The MCC, a Washington State prison facility with an operating capacity of

8   approximately 2,400 male offenders, is run, overseen and subject to DOC regulations.

9          12.      MCC has five primary facilities with different custody levels, including

10  maximum, close, and minimum.

11         13.      During the course of the investigation, BOWDEN worked in three units:

12  (1) Intensive Management Unit – a maximum security unit; (2) Washington State

13  Reformatory – a medium security unit; and (3) the Twin Rivers Unit ("TRU") – a

14  medium and minimum security unit.

15         14.      From July 2013 through July 2014, BOWDEN held the job title of

16  "Correctional Officer 1," during which his job duties included supervising inmates and

17  ensuring the safety of the facilities at MCC.

18         15.      In July 2014, BOWDEN's job title changed to "Correctional Officer 2."

19         16.      On July 10, 2015, BOWDEN's base salary, excluding voluntary or

20  mandatory overtime pay, was approximately $40,212.

21  **DOC Policies Governing BOWDEN's Conduct**

22         17.      On July 3, 2013, during employee intake and introduction, BOWDEN

23  agreed to and signed the DOC "New Employee Policy Acknowledgement," stating and

24  affirming to, among other things: (1) receipt of the DOC Employee Handbook; and

25

26

27  _____

[2] During the course of the investigation, I also gave CHS-1 one payment of $750 cash in exchange for her
28  assistance.

Complaint/Bowden - 7

1   (2) understanding his responsibility to be familiar with and abide by: (a) DOC 800.010

2   ("Ethics"); (b) DOC 850.030 ("Employee Relationships/Contact with Offenders"); and

3   (c) DOC 190.500 ("Smoking Policy").

4        18.    DOC 850.010 Directive III(A), governing DOC employees, states, among

5   other things, that "Employees/contract staff will not accept any gifts, rewards, or

6   gratuities from any source, except as authorized by policy," as outlined in greater detail in

7   DOC 850.030.

8        19.    Among other things, DOC 850.030 states that "Employees, contract staff,

9   or volunteers will not transmit messages, mail, or property for or to offenders or their

10  known immediate family or associates, except when authorized as part of their official

11  duties."

12       20.    Moreover, DOC 850.030 states that "No employees, contract staff, or

13  volunteer will give or accept gifts/gratuities/favors, barter or have any financial dealings

14  with or for offenders or their known immediate family or associates."

15       21.    Additionally, DOC 850.030 states that "Personal or business

16  communications and relationships with offenders or their known immediate family or

17  associates are inappropriate and prohibited…," and "Employees, contract staff, and

18  volunteers will report contact with offenders or their known immediate family or

19  associates, not authorized within official duties, to their Appointing Authority on DOC

20  03-039…no later than the next working day."

21       22.    DOC 190.500 states, among other things, that "Offenders may have access

22  to smoke producing substances for religious practices and religious group use as

23  authorized by DOC 560.200 Religious Program" and "Offenders will not be permitted to

24  use any other tobacco products." DOC 190.500 further states that "Disciplinary action

25  may be initiated against staff for the introduction of any unauthorized tobacco products

26  into the secure perimeter of a Prison."

27

28   Complaint/Bowden - 8

1 | **Reports to DOC of BOWDEN's Efforts to Smuggle Contraband into MCC**

2 |     23.    In December 2015, DOC Intelligence and Investigations Unit ("DOC-IIU")

3 | personnel received inmate reporting that BOWDEN was smuggling in chewing tobacco

4 | and illegal narcotics into MCC for the benefit of inmates in exchange for bribe payments.

5 | DOC-IIU is responsible for conducting investigations concerning inappropriate conduct

6 | by inmates and MCC personnel, with a focus on the smuggling of contraband into the

7 | facility.

8 |     24.    On May 2, 2016, an Investigator from DOC-IIU filed a report, based on

9 | information received from Inmate-1, corroborated by another inmate ("Inmate-2"), that

10 | BOWDEN smuggled in chewing tobacco for another inmate.

11 |     25.    On May 5, 2016, an Investigator from DOC-IIU filed a report based on

12 | information received from Inmate-2 that Inmate-1 and a co-conspirator inmate ("Inmate-

13 | 3") were receiving heroin secreted in a contraband can of chewing tobacco smuggled into

14 | the facility by BOWDEN.  Inmate-2 reported that BOWDEN meets an associate of

15 | Inmate-1 outside MCC to take delivery of the contraband to smuggle into the facility.

16 | Inmate-2 stated that Inmate-3 "signed" to him the day prior that Inmate-3 was getting

17 | some "black" in.  In my training and experience, "signed" means that Inmate-3 gave

18 | Inmate-2 a hand signal and the reference to "black" means black tar heroin, a controlled

19 | substance.

20 |     26.    On May 6, 2016, an Investigator from DOC-IIU filed a report based on

21 | information received from a separate inmate ("Inmate-4"), regarding BOWDEN's

22 | unauthorized access to a prison computer system in which he was disclosing information

23 | to inmates regarding the location and offender status of various offenders held in custody

24 | in the DOC system.

25 |     27.    On May 28, 2016, an Investigator from DOC-IIU received a report from

26 | another inmate ("Inmate-5") stating that BOWDEN was smuggling contraband

27 | methamphetamine into MCC for the benefit of inmates inside the prison.

28 | Complaint/Bowden - 9

1  |  28.     On July 4, 2016, July 5, 2016, and July 7, 2016, an Investigator from DOC-

2  IIU filed separate reports, detailing information from Inmate-5 stating that BOWDEN

3  was bringing in heroin for an offender housed at MCC.

4  |  29.     Based upon data I received from MCC, there has been a significant increase

5  in the number of inmates testing positive for the use of controlled substances in 2016.

6  Officials at MCC reported that in 2015, there were seven confirmed positive urinalysis

7  (UA) drug tests from inmates housed at TRU.  In 2016, there have been at least 56

8  positive UAs to date, with the majority being for methamphetamine.

9  **Smuggling of Contraband Tobacco**

10  |  30.     Based upon the above information, the FBI began utilizing CHS-1 in an

11  effort to determine if BOWDEN was in fact smuggling contraband into the MCC.  I

12  directed CHS-1 to set up a meeting with BOWDEN, similar to those alleged to have

13  taken place prior to the FBI investigation, in which BOWDEN would receive cash in

14  exchange for smuggling tobacco into the MCC for the benefit of Inmate-1.

15  |  31.     On or about July 6, 2016, CHS-1 participated in a text message exchange

16  with BOWDEN and I collected and preserved electronic screen captures of the referenced

17  messages:

18  CHS-1:      I have some money for you and I wanted to see if we could meet so I can

19  give you some more chew [meaning smokeless tobacco].

20  BOWDEN:   oh right on, how much?

21  CHS-1:      $500

22  BOWDEN:   cool, cool, we have a slight issue with the chew though. Where were you

23  thinking? sorry, when*

24  CHS-1:      What's the issue with the crew [sic] I was thinking Monday or Tuesday.

25  What day would work better for you?

26

27

28  Complaint/Bowden - 10

| | | |
|---|---|---|
| 1 | BOWDEN: | Either or. Because I have people snitching on me ever since they got |
| 2 | | busted. Is this for [Inmate-1], or him and [Inmate-3[3]]? I get searched when |
| 3 | | I go in now. |
| 4 | CHS-1: | No shit that's crazy…This is for [Inmate-1]. I don't think they are in the |
| 5 | | same unit anymore. |
| 6 | BOWDEN: | yeah, I'm treated like an inmate now, bag search, pocket checks and pat |
| 7 | | down. So it'll be hard to get him anything right now. When it cools down |
| 8 | | I have no problem getting him stuff in. |

9      32.    On July 12, 2016, BOWDEN met with CHS-1 in Everett, Washington. The

10 meeting was audio recorded and law enforcement personnel conducted physical

11 surveillance. Prior to and at the conclusion of the meeting, CHS-1's person and vehicle

12 were searched by the FBI to ensure there was no unaccounted for currency or contraband.

13 CHS-1 was given five cans of berry flavored Skoal brand smokeless chewing tobacco

14 and $500 in United States currency. During that meeting, CHS-1 gave BOWDEN the

15 five cans of berry flavored Skoal chewing tobacco and $500 in cash.

16      33.    I have reviewed the audio recording of that July 12th meeting. The audio

17 recording reveals that during the July 12th meeting, BOWDEN told CHS-1 inmates are

18 "ratting" on BOWDEN after they got "popped." BOWDEN said one of the inmates is

19 working with "INI"[4] and that BOWDEN is now getting patted down and searched on

20 certain days when he comes to work at MCC. CHS-1 gave BOWDEN the cans of

21 chewing tobacco and told BOWDEN that "[Inmate-1] is anticipating that you're not

22 going to bring all of it in today." In response, BOWDEN asked when Inmate-1 was

23 going to "come down." Based on my training, experience, and discussions with DOC-IIU

24 personnel and CHS-1, I knew this to mean that Inmate-1 applied, on specific occasions,

25

26

---

27 [3] On the recording, BOWDEN uses the nickname for Inmate-3.

28 [4] I know based upon conversations with DOC-IIU personnel that the reference to "INI" refers to "Intelligence and Investigations" meaning DOC-IIU.

Complaint/Bowden - 11

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  to leave Inmate-1's cell and be in BOWDEN's area of responsibility in order to meet

2  with BOWDEN and take delivery of the contraband.   BOWDEN replied "If it takes a

3  couple extra days to get it, it's not a big deal as long as it keeps us all safe."

4      34.    The audio recording also revealed that CHS-1 told BOWDEN there is "five

5  hundred in there" referring to the $500 cash CHS-1 gave to BOWDEN in the paper bag.

6  CHS-1 also said "what he [meaning Inmate-1] said is that, it's just him being in good

7  faith for paying off what you brought for [Inmate-3]." BOWDEN replied, "Yeah that

8  whole thing got all fucked up…they were supposed to make good money on it…like a

9  few grand…I'm like, I'm not asking a lot dude…split it thirds with me, because I know

10  he was working with somebody else…I was like, alright, I'll do this for you guys, split it

11  thirds with me, I don't want a lot, usually guys that bring it in, they want half, half if not

12  more…So, I'm like dude, I'm not worried about it…do your thing, don't use it!... I was

13  like, don't get high….that's the easiest way to get busted."

14      35.    BOWDEN then detailed how the inmates used the illegal narcotics he

15  brought in for them and how [Inmate-3] got "popped." BOWDEN said that he hoped

16  [Inmate-3] was not going to "snitch."

17      36.    BOWDEN also told CHS-1 that he makes $17.50 per hour as a

18  Correctional Officer at MCC, so he does not really care if he gets fired "as long as [he

19  does not] get any time for it." BOWDEN expressed concern about getting a job at

20  another facility, though, stating, "I've done too many drugs in my life" and "I don't know

21  if I can pass a polygraph."

22      37.    BOWDEN also told CHS-1 "I had some gang tattoos.  I just got 'em

23  covered up" and that he was in the "Surenos" gang. As set forth above, a number of

24  inmates had provided information to DOC-IIU about BOWDEN's smuggling of

25  contraband.  In those reports, the inmates had alleged that BOWDEN had been

26  smuggling contraband for the benefit of former members of the Surenos and Nortenos

27  gangs housed at MCC.

28  Complaint/Bowden - 12

1       38.    On July 13, 2016, MCC personnel took custody of chewing tobacco with an

2   obvious pungent sweet odor from Inmate-1 and entered it into MCC evidence.  The

3   sealed package was placed into FBI evidence on September 22, 2016.  The Chief

4   Investigator at MCC confirmed this was the same tobacco delivered by CHS-1 to

5   BOWDEN on July 12, 2016.  The Chief Investigator noted that sweet smelling tobacco

6   with this pungent odor had never been recovered at MCC prior to this investigation.

7   Moreover, the tobacco has a very unique odor that I immediately recognized prior to

8   submitting to FBI evidence technicians.

9       39.    On July 21, 2016, personnel at MCC took custody of a "Blue Glove

10  W/Tobacco (chew) in four fingers. (All in a white crew sock)" from Inmate-1 and entered

11  it into MCC evidence.  The sealed package was placed into FBI evidence on September

12  22, 2016.  The Chief Investigator at MCC confirmed this was the same tobacco delivered

13  by CHS-1 to BOWDEN on July 12, 2016.  As noted above, BOWDEN told the CHS-1

14  that he needed to smuggle the chewing tobacco on separate occasions.  The Chief

15  Investigator noted that sweet smelling tobacco with this pungent odor had never been

16  recovered at MCC prior to this investigation.  Moreover, the tobacco has a very unique

17  odor that I immediately recognized prior to submitting to FBI evidence technicians.

18  **Smuggling of Contraband Electronic Device**

19      40.    After hearing BOWDEN describe how he had smuggled illegal narcotics

20  into the MCC for Inmate-3 and CHS-1's reporting that BOWDEN had mentioned

21  wanting to do the "hard stuff," the FBI decided to conduct additional investigation to

22  determine if BOWDEN would smuggle illegal narcotics into MCC.  On or around July

23  19, 2016, through July 31, 2016, CHS-1 and BOWDEN exchanged a number of text

24  messages at the direction of the FBI.  In the text message exchange, which I collected and

25  preserved and which is set forth below, CHS-1 and BOWDEN discussed BOWDEN

26  taking a sim card into MCC in exchange for cash.

27

28  Complaint/Bowden - 13

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE
5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1        41.    In my experience and training, I know a "sim" or "sim card" to be the

2  common vernacular used to describe a Subscriber Identity Module (SIM) card which is

3  used in modern cellular telephones and is necessary to activate or utilize a cellular

4  telephone.  SIM cards are often illegally used inside prison facilities to active and utilize

5  cellular telephones that have been previously smuggled in by or left behind by inmates.

6  CHS-1:      Good morning! I wanted to let you know I have a sim card for [Inmate-1]

7               with some money.  You guys can talk more about it today.  After you talk,

8               let me know and we can plan a time to meet tomorrow if that works for you

9               :)

10  BOWDEN:  Ok.

11  CHS-1:      Hey there! Do you know want to meet at the same spot again at noon?

12  BOWDEN:  Nah, tell him to lay low for the week. It's a no go right now. big time hot. I

13                don't know what happened but I got pulled aside tonight and called out.

14               They said they know it's me but they can't catch me.  I didn't give them

15               any info and just laughed at them and told them I didn't know what they

16               were talking about@

17  CHS-1:      Hey there.  How did things go last week? Are we good to meet up this

18               week?

19  BOWDEN:  Idk I'm still getting searched like a mofo. He already has a phone? Just

20               needs the SIM card?

21  CHS-1:      Yes! And he's out of chew.  You can wrap the card in plastic wrap and

22               stick it inside the chew if that's easier.

23  BOWDEN:  I can do the sim, I might be able to do the chew. But I can't promise that

24               They're on my ass big time

25  CHS-1       Not a problem! We obviously don't want to jeopardize anything.  I have a

26               pretty busy day tomorrow so I'm thinking Wednesday around 11:30. Does

27               that work for you?

28  Complaint/Bowden - 14

42.     On August 2, 2016, CHS-1 spoke with BOWDEN on the telephone at the direction of the FBI and the conversation was recorded.  Among other things, BOWDEN told CHS-1 "I have no problem getting him the SIM card…if he does get caught with it, if he could just stay solid and not fucking dime me out."  BOWDEN also told CHS-1 that Inmate-1 needed to stay away from [Inmate-3] because [Inmate-3] is working with INI".  BOWDEN said that [Inmate-3] is pissed off because "I cut him off."

43.     BOWDEN also said that he has no problem bringing in the SIM card because it is small enough and he will not get caught smuggling it in.  BOWDEN told CHS-1 not to discuss "business" with Inmate-1 on the phone and only discuss in person and to use "code words" when discussing business.  In my training and experience, I believe that by "business" BOWDEN meant his smuggling of contraband into MCC for Inmate-1.  During the phone call, BOWDEN and CHS-1 agreed to meet the next day.

44.     On August 3, 2016, CHS-1 met with BOWDEN in Everett, Washington at the direction of the FBI.  The audio of the meeting was recorded and physical surveillance was conducted by law enforcement personnel.  Prior to and at the conclusion of the meeting, CHS-1's person and vehicle were searched by the FBI to ensure there was no unaccounted for currency or contraband.  CHS-1 was given $200 cash and a SIM card, bearing serial number 890130 0801229077580F.  CHS-1 provided BOWDEN the $200 cash and SIM card, which BOWDEN agreed to smuggle into the prison at MCC for the benefit of Inmate-1 in exchange for the cash payment.

45.     BOWDEN said that he has a "couple of buddies" that he "works with" and likes to "party" with, but "even they don't know I'm bringing in shit." [referring to BOWDEN's smuggling of contraband into MCC].  CHS-1 confirmed that BOWDEN was referring to other employees at MCC.

46.     BOWDEN said he knows Inmate-3 is a "snitch," but BOWDEN is ok dealing with CHS-1 and Inmate-1.

Complaint/Bowden - 15

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1      47.    BOWDEN also told CHS-1 that "[Inmate-3's] cousin's got my number."

2  CHS-1 said "didn't you say that you were working with his cousin?"  In my training,

3  experience, and through the facts discovered during the course of the investigation, it is

4  my understanding that "working" with is a reference to BOWDEN's scheme in which he

5  was smuggling narcotics in for the benefit of [Inmate-3's] cousin, another inmate at

6  MCC.  BOWDEN replied "yeah" and continued "his cousin's in the hole…somebody

7  snitched on him for something, he's in the hole now…that whole place is full of fucking

8  snitches, it's horrible, it's so bad…if this were any other prison, people would be stabbed

9  every fucking day…even when guys come to me and they snitch, I'm like, I don't want to

10  fucking hear it.  I don't deal with snitches."  CHS-1 told BOWDEN "I made it very clear

11  to [Inmate-1] that he is not to use any of what…I don't want him to get popped

12  randomly…this is strictly a business situation."

13      48.    During the meeting, BOWDEN detailed how he is currently being searched

14  at work, so it is becoming increasingly difficult to smuggle in chewing tobacco and

15  narcotics.  During the meeting, CHS-1 asked BOWDEN, "So they are checking other

16  people too consistently?" and BOWDEN replied "Not consistently, no."

17      49.    CHS-1 asked "Do you think anyone else, as far as cop-wise, is doing shit?"

18  and BOWDEN replied "Oh, most definitely…somebody is bringing in heroin, I know

19  that for a fact…so [Inmate-3's cousin], which is [Inmate-3's] cousin…somebody was

20  bringing him stuff before I started hooking him up, and then…the first time it started

21  getting hot, I was like, cut everything off, sorry guys…but they were still getting shit

22  in….Whoever it is, I think it's a couple people, I don't really ask…I don't want to

23  know…If I did ask and then tell me, I think I'd be mad…because if it went the other

24  way…they snitch me out."

25      50.    BOWDEN said "that's why I was pretty much just fucking with [Inmate-

26  3's cousin], because he's a high ranking Sureno…I know he won't snitch, no matter what

27  the fuck happens."

28  Complaint/Bowden - 16

1    51.   BOWDEN and CHS-1 also discussed inmates at MCC using

2   methamphetamine that BOWDEN had smuggled into the MCC for their own personal

3   use instead of selling the narcotics for money.  BOWDEN said "with what I brought

4   them, they could have made about four grand…if they would have just flipped it…a gram

5   of 'shards' goes for like three hundred bucks…for a gram of 'shards.'"   I know in my

6   training and experience, that "shards" refers to methamphetamine.  CHS-1 said "I

7   couldn't even imagine being high in prison" and, in response, BOWDEN said "I

8   wouldn't want to…the only thing I'd want to do in prison is smoke weed…but that's too

9   easy to get caught because it smells too bad.  That's the first thing they brought to

10   me…dude can you get me some weed. I'm like no, not happening…the kind of weed I

11   get you can smell from fucking fifty feet away…I get primo fucking Washington weed."

12    52.   CHS-1 asked BOWDEN, "so you've only brought in shards, then?" to

13   which BOWDEN replied, "Yeah…I told them I don't want to fuck with 'black'…I'm not

14   a big fan of heroin…shards, whatever, you can't OD [meaning overdose] on 'shards.'"

15   BOWDEN said he will not bring in heroin because he cannot bring it in every week and

16   inmates will get sick if they do not have a regular supply coming in.  BOWDEN said he

17   will not smuggle in "oxy" because "oxy" is too expensive on the street.  BOWDEN

18   continues "If it was five years ago, shit I'd bring in 'oxy' all day."  In my training and

19   experience, "black" refers to black tar heroin and "oxy" refers to Oxycodone, both

20   controlled substances.

21    53.   CHS-1 asked BOWDEN if Inmate-1 should plan to come see BOWDEN

22   that day at MCC.  BOWDEN told CHS-1 to have Inmate-1 come see him that day and

23   that he will have it [meaning the SIM card] when Inmate-1 shows up.  CHS-1 then gave

24   BOWDEN $200 in cash and the SIM card to be smuggled into MCC.  BOWDEN told

25   CHS-1 to ensure that Inmate-1 does not use the SIM to call BOWDEN and to keep

26   BOWDEN's "number out of it."

27

28   Complaint/Bowden - 17

54.   On August 4, 2016, personnel at MCC took custody, from Inmate-1, of the SIM card CHS-1 gave to BOWDEN on August 3, 2016.  The SIM card serial number was noted by the Chief Investigator of DOC-IIU at MCC and placed into evidence at MCC.  I compared the serial number and verified it to be the same SIM card that CHS-1 gave to BOWDEN on August 3, 2016, at the direction of the FBI.  The sealed package containing SIM card, serial number 890130 0801229077580F, was entered into FBI evidence on September 22, 2016.

Smuggling of Contraband Narcotics

55.   On August 23, 2016, CHS-1 spoke with BOWDEN on his cellular telephone.  Because CHS-1 was out with friends, CHS-1 did not record this call. According to CHS-1's reporting, BOWDEN said that he was not able to meet very long with Inmate-1 because there were too many cops [meaning Correctional Officers] around. BOWDEN expressed concerns that inmates and/or other Correctional Officers were "snitching" on him for smuggling in contraband.  BOWDEN did not want to bring in any more narcotics until things quieted down at MCC because he did not want to get caught. BOWDEN said that he was not smuggling in any narcotics for anyone right now because it was too "hot" at MCC.  In order for BOWDEN to smuggle narcotics into the secure area at MCC, he needs to pass through screening.  During screening there is potential that his bag and/or person may be searched.  Additionally, there is potential that a canine, trained to alert on narcotics, could be present at screening.

56.   On August 29, 2016, I interviewed Inmate-1 with assistance from DOC-IIU.  Inmate-1 reported that BOWDEN wanted CHS-1 to reach out to BOWDEN to set up a meeting during which CHS-1 would deliver one half ounce of methamphetamine and $1,000.  At the direction of DOC-IIU, Inmate-1 had told BOWDEN that Inmate-1 needed a cellphone to aid in the distribution of narcotics inside MCC.  CHS-1 later told BOWDEN that Inmate-1 was able to get a cellphone, but he needed a SIM card.  After BOWDEN delivered the SIM card to Inmate-1, Inmate-1 told BOWDEN that he would

Complaint/Bowden - 18

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  be ordering methamphetamine from a dealer who would then deliver it to BOWDEN

2  with a cash payment to serve as payment for the BOWDEN smuggling the

3  methamphetamine into MCC.  Inmate-1 also reported that he and BOWDEN had

4  discussed giving BOWDEN a portion of the profits from the sale of the meth inside

5  MCC.  BOWDEN said that he did not want to meet with anyone else, because BOWDEN

6  trusts CHS-1.  BOWDEN would then smuggle the methamphetamine, provided by CHS-

7  1, to Inmate-1 for Inmate-1 to sell and distribute inside MCC.  Inmate-1 also suggested to

8  BOWDEN that CHS-1 could get cocaine for BOWDEN's personal use.

9       57.     On September 19, 2016, CHS-1 and BOWDEN participated in the

10  following text message exchange at my direction:

11  BOWDEN:   We good for tomorrow?

12  CHS-1:     Yes! I wasn't able to meet with them [meaning the alleged drug dealers

13             known to CHS-1] today but will in the morning.  See you tomorrow

14  BOWDEN:   Ok cool.  Are these your people [meaning the alleged drug dealers known

15             to CHS-1]?

16             Let [Inmate-1] know that he's going to have to come after dinner

17             movements for the next 2 days.

18       58.     On September 20, 2016, BOWDEN met with CHS-1 in Everett,

19  Washington.  The meeting was audio recorded and law enforcement personnel conducted

20  surveillance.  Prior to and at the conclusion of the meeting, CHS-1's person and vehicle

21  were searched by the FBI to ensure there was no unaccounted for currency or contraband.

22  I provided CHS-1 with approximately one half ounce of a substance made to look like

23  methamphetamine, one can of chewing tobacco, and $1,000 in cash.  The white

24  crystallized substance was tightly packaged into a small clear ziplock type baggie with

25  clear tape over the top and then placed inside a larger pink-clear ziplock type baggie with

26  clear-yellow packing tape over the top.  During the meeting, CHS-1 gave BOWDEN the

27  substance in the package and the can of chewing tobacco for BOWDEN to smuggle into

28  Complaint/Bowden - 19

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  the prison facility at MCC for the benefit of Inmate-1.  CHS-1 also gave BOWDEN the

2  $1,000 in cash for payment to smuggle the narcotics into MCC and as BOWDEN's

3  portion of the proceeds from the sale of the narcotics inside the facility.

4       59.    During the September 20th meeting CHS-1 asked, in reference to

5  BOWDEN's prior comments that he was being searched at MCC and he was being

6  watched for smuggling in contraband, "So how's it been…been better, I'm assuming?"

7  BOWDEN responded, "A little bit."  CHS-1 then said "Yeah, I know you…we were

8  waiting a little bit, you know, just for things to cool down."  BOWDEN responded that

9  "things are starting to cool down a little bit…they've started to do bag searches, pat

10  downs on everybody…I'm not the only one."  BOWDEN continued to say "there has

11  been a shit ton of stuff coming in."  In my experience and from conversations with DOC-

12  IIU personnel at MCC, it is my understanding that inmates had been drug tested at MCC

13  during the prior weeks and it was discovered that narcotics were being introduced into

14  and used by the inmate population at MCC.  ·

15       60.    During the September 20th meeting CHS-1 also said, in reference to the

16  substance made to look like methamphetamine, "I had my friend try to deodorize it as

17  much as possible, cause I didn't know how you were going to…so it's in two

18  baggies…I'll show it to you…one's a bigger baggie and then one's a smaller one.  The

19  smaller one was deodorized and it's like sealed as tight as possible for dogs, in case…"

20       61.    During the September 20th meeting CHS-1 also discussed getting "coke"

21  [meaning cocaine] for BOWDEN's personal use, but stated that CHS-1 was unable to get

22  it for BOWDEN before the meeting.  CHS-1 stated "I have the thousand bucks in there

23  for that…" in reference to the $1,000 in cash BOWDEN accepted in exchange for

24  smuggling in the substance made to look like methamphetamine.  CHS-1 told BOWDEN

25  that Inmate-1 was expecting it "tonight," and BOWDEN stated that "I'd rather bring it all

26  in at once," in reference to the package containing the fake methamphetamine.

27  BOWDEN continued "that's why I told him [Inmate-1] later, cause if they do have the

28  Complaint/Bowden - 20

1  drug dog in there, he usually leaves about four."  CHS-1 then showed BOWDEN the

2  $1,000 in cash, the package of substance made to look like methamphetamine and one

3  can of chewing tobacco.

4      62.    During the September 20, 2016 meeting, BOWDEN told CHS-1 that he

5  recently did an "8-ball" with a girlfriend of his and it was not of good quality.  In my

6  training and experience, BOWDEN is referring to cocaine.  CHS-1 and BOWDEN

7  discussed current pricing for an "8-ball" of cocaine and CHS-1 said "I hear the 'shards'

8  are…what you're bringing today…I hear that should be good…"  CHS-1 continued

9  "make the coke as good as the shards and we'll be good to go."  In my training,

10  experience and review of recordings with BOWDEN, "shards" refers to

11  methamphetamine.

12      63.    On September 20, 2016, I received a telephone call from the Chief

13  Investigator in DOC-IIU notifying me that Inmate-1 had taken delivery of the same

14  substance in the same packaging CHS-1 delivered to BOWDEN to be smuggled into

15  MCC, and that Inmate-1 had provided it to DOC-IIU.  On September 21, 2016, the Chief

16  Investigator notified me that he had taken custody of the same package earlier in the

17  morning and entered it into MCC evidence.  The package was entered into FBI evidence

18  on September 22, 2016.

19  **Effect on Interstate Commerce**

20      64.    The illegal sale, distribution, possession with intent to distribute, and

21  trafficking in controlled substances, that is, methamphetamine, are activities that affect

22  interstate commerce.

23      65.    Additionally, I know that the chewing tobacco and SIM card BOWDEN

24  delivered to Inmate-1 were manufactured outside Washington State and are items that are

25  shipped in interstate commerce.

26  //

27  //

28  Complaint/Bowden - 21

## **CONCLUSION**

66.    The above facts are true and correct to the best of my knowledge and belief. Based upon the above, I believe there is probable cause to believe that MICHAEL W. BOWDEN has committed acts in violation of Title 18, United States Code, Section 1951(a)  and Title 21, United States Code, Section 841(a)(1)  as alleged in this Complaint and Affidavit.


Matthew A. Thoresen
Special Agent
Federal Bureau of Investigation


Based upon the Complaint and Affidavit sworn to before me, and subscribed in my presence, the Court hereby finds that there is probable cause to believe the defendant committed the offenses set forth in the Complaint.

Dated this _27th_ day of September, 2016.


HON. BRIAN A. TSUCHIDA
United States Magistrate Judge

Complaint/Bowden - 22

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970